Ladies and gentlemen, please rise. This court is now in session. You may be seated. The clerk will call the next case. 321-058 Illinois Appropriations Control Board, people of the state of Illinois, and I believe I've heard the feedback, versus Ironhustler Excavating, Inc. an Illinois appropriations account by Jay Scholl. Mr. Scholl, you may proceed. Good afternoon. May it please the court, my name is Jay Scholl, and I represent the appellant in this case, Ironhustler Excavating. This is an appeal from a decision of the Pollution Control Board over the imposition of monetary penalties, which should have never been brought. This is a case where the record establishes several things. The violations were not willful or deliberate. There was no long-term injury to the environment. There was no economic benefit to Ironhustler. And in good faith, the property was bought into compliance within 10 days after materials were diverted without the knowledge of management of Ironhustler. Despite no evidence to the contrary, the Pollution Control Board arbitrarily, capriciously, and unreasonably imposed an $80,000 penalty against Ironhustler. We're asking this court to reverse the imposition of the fine. The Illinois Environmental Protection Act establishes a framework for its enforcement. Although fines are a part of the framework, this court has noted that fines are not warranted in every case, stating from Insidio Moline versus Pollution Control Board, quote, a fine should not necessarily be imposed once a violation has been found. It is only when a fine would aid in enforcement of the act that such a penalty should be imposed. Punitive considerations are secondary, end quote. In the case relied upon by the state, the court noted that, quote, the act does not confer upon the board the authority to impose a civil penalty in every case of violation of the act or regulations. The record must demonstrate an adequate rationale for the imposition of the penalty, and the penalty must be commensurate with the seriousness of the infraction. The statute gives, end quote, the statute gives factors to use when addressing the rationale for imposing whether to impose a penalty at all. Among other factors, these are things like the injury to the environment and any subsequent compliance. The statute also gives factors to use when assessing what penalty, if a penalty is determined to be appropriate, what penalty would be commensurate with the seriousness of the infraction. These factors are things like the duration and gravity of the violation and any economic benefits occurred by the respondent. So what happened here? Iron Hustler was subcontracted to remove demolition materials from the tear down and construction of a school in Delavan, Illinois. In doing so, Iron Hustler arranged for materials to be transported by truck from the project to a lawful disposal facility located in Tadsworth County, Illinois. In fact, 208 loads of materials were taken from the project directly to the landfill facility. On July 13th of 2017, however, Iron Hustler received notice that the Illinois EPA had conducted an investigation at a farm at which it was alleged materials had been deposited from the project. This came as a surprise to Iron Hustler, at least its management. Management of Iron Hustler was not aware that the materials had been taken anywhere other than their prearranged lawful disposal facility. The next day, Iron Hustler reviewed the time cards of the truckers that showed 24 loads were taken to a farmer or a farm site rather than to the landfill. Thereafter, Iron Hustler acted quickly to remove the materials. Keep in mind the type of materials that we're talking about here. Demolition materials like clean concrete, that is without rebar or other materials in it, can be used for erosion control. The materials removed and taken to the farm have purportedly been taken there for the purpose of erosion control. The problem comes if that concrete and other materials contains additional substances like wood and rebar. If so, the materials can't be used for erosion control. At the time of the removal and to this day, there is no first-hand evidence establishing that the materials delivered by Iron Hustler's trucks were not clean concrete. Certainly, there would have been some materials from the project that could have not been used for erosion control. However, keep in mind that 208 out of 232 loads, almost 89%, were taken to the prearranged disposal site. So it is possible that only clean materials were deposited from the school site. On July 17th of that year, this is four days after receiving notice of the diversion. There was evidence that the dumped waste included electrical wire, metal radiators, wood, rebar, wire conduit, metal sheeting, metal angle iron, painted brick, plywood, metal studs, metal pipe, painted concrete slag, and ceramic tile. Yes, there were all of those types of materials found at the site. We don't know and we don't believe that the state has established that those materials were necessarily put there by Iron Hustler's employees or contractors. So four days after receiving notice of the diversion of materials, Iron Hustler caused 29 loads of materials to be taken from the farm to the landfill. This was 10 days after the loads were delivered. This was four days after receiving notice of the diverted materials. And it's important to note that there were five additional trucks taken out of the site than Iron Hustler had actually taken into the site. So there were five truckloads worth of materials that we can only presume preexisted the materials that were taken there by Iron Hustler's employees. Did the record reflect how it was that the truck drivers wound up taking this to the farm as opposed to the landfill? I believe so, Your Honor. It was a conversation, I think, between small communities. Someone was asked, hey, I have a river, a stream, that I need to use some erosion control. And the employee Was there a money incentive? We're not aware of any kind of money. And your investigation showed? There's zero record establishing there was any kind of money incentive. In fact, our investigation didn't show anything of the kind. All right. Thank you. The next thing that Iron Hustler did after it cleaned up the site was it terminated the employment of the employees who were involved in the diversion. Additionally, Iron Hustler implemented additional policies to ensure that materials were not diverted, would not be diverted from previously arranged lawful disposal facilities. After these efforts by Iron Hustler, the EPA acknowledged later in November that the site had returned to compliance. At this point, the mere threat of enforcement had served its purpose. The property was in compliance with no long-term environmental consequences. But that wasn't enough for the Illinois EPA to bring the site into total compliance. Removing more materials than had been deposited there was not enough. It sought additional enforcement. In the course of the administrative process, seeking to bring the sites into compliance, Iron Hustler offered to enter into a compliance commitment agreement. Not only did the Illinois EPA reject that proposal, it did so five days before receiving Iron Hustler's proposal and seven days before that proposal was even due. Eventually, this matter made its way to the Pollution Control Board. The state relied almost entirely on a two-page affidavit from Jason Thorpe, an employee of the Illinois EPA who was at the farm twice. That affidavit is found in A064. The affidavit contains no eyewitness statement. That demolition debris was improperly deposited by Iron Hustler. The affidavit contains no statement as to the short-term impact on the environment. The affidavit contains no statement as to the long-term impact on the environment. The affidavit contains no statement as to any knowledge of the diversion of materials by management of Iron Hustler. The affidavit contains no statement establishing any economic benefit to Iron Hustler. In fact, the record is completely devoid of any eyewitness statement establishing those facts, not even the property owner with whom the IEPA settled. The Illinois EPA could not and did not establish its burden to establish violations. But what's more, even if it could, its lack of evidence supporting the other factors is contradicted by the direct evidence that was offered by Iron Hustler. Dave Sheline, the president and sole member of the board of directors of Iron Hustler, in his affidavit, which is found in A142, stated that management of Iron Hustler was not aware of the diversion of materials. He stated that not knowing the origin of the unclean construction material, Iron Hustler acted immediately anyway to clean up the site. The affidavit stated that Iron Hustler brought the site into compliance and terminated the employees who were responsible for the diversion. The affidavit stated that there were no economic benefits to Iron Hustler. And, in fact, the diversion of materials came at a cost to Iron Hustler because it had to ship the materials twice, once to the site and then once again to the landfill, when it had already arranged for the materials to be taken to the landfill, and, in fact, which was done for 208 loads worth of material. Despite the overwhelming weight of relevant admissible evidence, the Pollution Control Board adopted the speculation encouraged by the state and imposed an $80,000 penalty against Iron Hustler. The penalty, contrary to the purpose of the act, actually serves to discourage good faith efforts to bring an end to the pollution control problems. Iron Hustler acted quickly and swiftly because it wanted to see that the problem was cleaned up, regardless of who was responsible for it. Beyond being contrary to the relevant admissible evidence, the decision of the Pollution Control Board is arbitrary, capricious, and unreasonable and should be reversed. Are there any questions? I do have a couple of questions because the factors that you discussed about the penalties, I mean, one of them is to deter further violations and enhance voluntary compliance, and one that you didn't speak to was whether there had been previously adjudicated violations. So they've had one in 2013, it appears for the same conduct, and that was $10,000. In 2019, a $3,000 penalty for the same thing. And again, this has... Those factors were considered to be the big factors of why they assessed this because it seems that they've done this before, and I know you mentioned once that they voluntarily cleaned this up without regard for who was responsible. Well, they were using their trucks. Their name was on the side. I mean, obviously, at least for 24 now, it seems like four loads might have been gratuitous, but they are responsible, and I seem to admit that they are responsible, and yet, even though they've been caught doing this before, it doesn't seem like it has stopped them. So are you disputing that that was a rational basis, whether we agree with it or not, but that the department can't use those two factors in fashioning this fine? Not necessarily, Your Honor. Those factors come into play after it's been determined that penalty should be imposed. So that factor goes into play when determining the amount of the penalty. We've got two steps before that  First is with respect to whether or not the materials came from Iron Hustler. It's their burden of proof. They're not entitled to speculation in terms of where it came from. And then number two is the factors in terms of whether or not to impose a penalty. We believe strongly favor that there not be a penalty imposed, and that's where the injury to the environment, absolutely no evidence of being any injury to the environment, any subsequent compliance, which we think here is extremely significant because of how quickly Iron Hustler acted to clean up the site. So only if the state can get through first establishing Iron Hustler was responsible for the violation, and then getting through establishing using those factors that a penalty should be imposed, then we get to the weighing of those things in terms of the past violations being a factor that can be considered. Even if considering that as a factor, though, it's a weighing of factors. We believe that when you look at the factors as a whole, including the duration, looking at those how much the penalty should be factors, the duration of gravity of the violation, any lack of any economic benefits, outweighs the $80,000 penalty. We may not be here right now having this conversation if it were a smaller penalty, but the penalty of, you mentioned $3,000, $10,000, and then $90,000 is significantly more and part of the basis for being unreasonable in this case. I have a final question. Your client is disputing that it was them that dumped? My client doesn't know one way or the other. The management of Iron Hustler wasn't there when it happened. The state hasn't presented evidence other than the fact that Iron Hustler trucks were there. We don't dispute that Iron Hustler trucks took 23 or 24 loads to the site, but we don't know if it was clean material or if it was not clean material, and it's not our burden of proof. That's on the state to establish that Iron Hustler is responsible for the violation. Thank you. And I would note that it was decided on summary judgment. Okay, that is for sure. Officer, is it B's there? Yes. B's there? You may proceed. May it please the Court? My name is Frank Bizet, and I represent the Illinois Pollution Control Board and the people of the state of Illinois. This Court should affirm the Board's decision to impose an $80,000 civil penalty against Iron Hustler because that decision was not arbitrary or capricious. Rather, the Board balanced all the governing statutory factors, weighing some in favor of Iron Hustler and some against it, and determined that an $80,000 penalty was appropriate based on the facts of this case. That penalty, the Board explained, would deter future violations of the Environmental Protection Act while reflecting the nature and severity of the violations, Iron Hustler's history of noncompliance, and Iron Hustler's efforts to comply with the act after the violation had been discovered by the Illinois EPA. Beginning with the evidence of the violation, here there is undisputed evidence that Iron Hustler dumped 24 truckloads of debris from the Delavan construction site at the Mackinac River site. The affidavit and photographs from Thorpe, the Illinois EPA investigator, established that those 24 truckloads, which amounted to 750 cubic yards or 567 tons of debris, were spread throughout the Mackinac River site, much of it on the water bank and some of it in the river itself. There's no dispute that there's no permit to operate a landfill there, and given all of that evidence, the Board found that it was undisputed that the violations of the act occurred. Iron Hustler argues that it's possible that perhaps there was another five truckloads of materials and that that is the only part of the debris that was general construction or demolition debris, but there are a number of problems with that argument. The first is that it rests entirely on speculation and unreasonable inferences. As the photographic evidence shows, the materials, the debris, which included electrical wire, metal, wood, rebar wire, conduit, brick, ceramic tile, and other different materials, was strewn throughout the entire site. When you look at the photographic evidence, I believe the first picture shows a map of the site and the 36 different places where the pictures were taken from. This is not a situation where maybe there was just some sort of a small amount of materials confined to a little area in the site. Rather, it was throughout and it was in the river itself. Iron Hustler's theory, I think, has to be that there were these extra five truckloads, which is itself speculation because we don't know if the trucks were completely full on the way back out when they were picking it up, did they pick up other dirt or other materials? But Iron Hustler's theory is that in addition that there were these 24 truckloads of, I guess, supposedly clean construction debris and then five other truckloads and then somehow those five truckloads of all these other materials was interspersed with the 24 truckloads of clean debris during the seven days that elapsed between the deposition of the debris and the investigation and that that's why the investigator found that material throughout the site. But the board is not required to make unreasonable inferences even when viewing in the light most favorable to the opposing party. And so the evidence here does establish a violation because it is undisputed that the 24 truckloads were deposited there and the photographic evidence and affidavits from Jason Thorpe show that that material was throughout the site and in the river itself. Turning to the penalty, the board weighed all of the statutory factors and found that while some of them weighed in Iron Hustler's favor, an $80,000 penalty was nonetheless appropriate to deter future violations of the Act and warranted by the severity of the violation as well as Iron Hustler's prior adjudicated violations of the open dumping provisions of the Environmental Protection Act. Starting with the severity and nature of the violation, the board did recognize that in terms of the duration of the violation, that was a mitigating factor that weighed in Iron Hustler's favor because it was only there for 10 days, but that the severity of the violation was a factor in aggravation. And again, I would point this Court to the substantial amount of materials that was deposited at the site. It was 24 truckloads, which equates to 750 cubic yards and 567 tons. This was not a small pile of demolition debris, but rather a very large amount that covered much of the site and went into the river itself. In addition, Iron Hustler had prior adjudicated violations of these open dumping provisions, and the board was entitled and properly took that into account when calculating the penalty and as manifested in the difference between the penalty for Iron Hustler and River City. River City received a smaller penalty because, as the board pointed out, they did not have prior adjudicated violations. In addition, the board also considered the deterrence effect of a penalty, which is a required consideration under Section 42H. The board did weigh Iron Hustler's post-violation conduct as a factor in mitigation, but the effect of that mitigating factor was necessarily limited because Iron Hustler did not remove this waste until after it had been discovered by the Illinois EPA investigator and after the landowner had told them to remove it. So this is very different from a case where perhaps the business is acting in good faith and trying to comply with the act but a violation occurs nonetheless, or a case where a violation occurs but then the business cleans it up on its own. Here, Iron Hustler only cleaned it up after it had been caught, and the board was entitled to impose a penalty that would deter future violations and incentivize other parties to comply with the act in the first instance before a violation has occurred and been discovered. Is there any formula that the department uses? It seems like a pretty significant jump from the fines that were flooding previously. There is no formula for this type of enforcement proceeding, but part of the explanation for the jump is the difference between this proceeding and one of the previous ones. For example, the $3,000 penalty was imposed pursuant to an administrative citation, which is more of an expedited process, and in that type of case, the penalty is set by statute, and so the board didn't have discretion on that one. Do you know whether in the previous violations they entered into a compliance agreement as part of the resolution? I'm not aware, Your Honor. That wasn't in the record. But to the extent that Iron Hustler does talk about that and the EPA's involvement, there's a couple important points I'd like to make. The first is that they do not argue, because they cannot argue, that the Illinois EPA acted in violation of the act at any point. The act gives discretion to the Illinois EPA on what to do in that, and it's up to them. And also very importantly, probably even more importantly, the Illinois EPA is not a party to this proceeding. While they investigated it initially, it was the Attorney General's Office that brought and maintained this action, and it was the board that ultimately issued the decision. So it's the board's decision that's at review, and I here actually only represent the board and the people. I don't represent the EPA because they're not a party to this action. A couple of quick questions. This is the record still. The things that once we read it all, but just for the sake of efficiency and out of curiosity, do you know what the tipping fee was per load if it had gone in the landfill? That I do not know, Your Honor. And that was part of the board's decision when they said... Is it part of the record in there somewhere if we went to look? No, I don't believe so. And the board commented on that in its decision when it was talking about the factor, about an economic advantage to violating. Yeah, they said there was no evidence on that, so they weren't going to take that into account. One more question to get the record, if you know. When the violations were discovered, all right, hold on, stop, 24 hours, was the project ongoing? In other words, was that the end of the project? Was it over when it was discovered, or was it ongoing when the discovery was made and the action was stopped? I don't believe the record's clear on that. There was the one big delivery where a number of the truckloads went to the landfill, but then these 24 went to the Mackinac River site, and I'm not aware of whether there were further deliveries after that. And if there were, I mean, if they had occurred after July 17th, then at that point, you know, the facts are kind of different as well. It's by that point when the EPA has discovered violation and the landowner has told Iron Hustler to move that away. And I guess I would also like to briefly address the argument that Iron Hustler makes about the effect of the violation having been terminated or ended by the time of the enforcement proceeding. The fact that the violation ended before the enforcement proceeding does not preclude the imposition of a penalty. Section 33A, in fact, specifically says that subsequent compliance shall not bar assessment of the penalty. And this Court has held at least three times by now that the fact that the violation has ended does not act as a bar to imposing the penalty. In addition, no single factor is determinative, and the Board has broad authority to fashion an appropriate penalty. That's part of the reason why the standard is arbitrary and capricious to the Board as the agency who's charged with administering the Environmental Protection Act has expertise and experience in these types of cases and determining what kinds of penalties are going to be most effective in achieving the Act's objectives. And so, you know, the Board was entitled to weigh the different factors, which they did here. I think it's also important to note that this is not a case where the Board found all of the factors weighed against Iron Hustler. They said some of them did, you know, were in litigation, were in the Board's favor, and they took those into account. And the penalty they ended up imposing was significantly less than the statutory maximum. So the $80,000 penalty does aid in enforcement of the Act, even if the violation has been, has ended, because it has a deterrence effect, both for Iron Hustler and other similarly situated parties in the future, in that it incentivizes them to comply with the Act in the first instance before a violation has occurred and been discovered. So unless Your Honors have any further questions, then the State Respondents would ask that you affirm the Board's decision. Thank you. Mr. Schultz for rebuttal. Your Honors ask about timing. The materials were taken from the project to a landfill between a period of June 28, 2017 and July 21 of 2017. So over a course of a little less than a month, materials were taken to the landfill. There was one day when materials were taken, were diverted from that landfill to a farm. That was July 7. They were removed on July 17, so I believe they were taken 10 days earlier on July 7 of 2017. So they were taken to the farm on what day? I believe July 7 is the day the materials were taken. They were removed from the farm, taken to a landfill on July 17. Now in terms of the bigger picture, the school project, materials were going from the school to the landfill from June 28, 2017 through July 21 of 2017. With respect to the argument that Iron Hustler did not remove materials until after the IEPA investigation, the only evidence is that Iron Hustler didn't know that these were violations, that the violations even existed. And the evidence shows that as soon as Iron Hustler did learn of the violations, it quickly acted to remediate them. Iron Hustler couldn't have possibly self-reported something that he didn't know about. He found out about it not from a formal notice from IEPA, but found out, I believe, through word of mouth, and acted on that and removed the materials quickly. Your Honor, I asked about a formula for enforcement. In the cases that I've reviewed, the pollution control board or the courts that review the pollution control board normally look to the economic benefit. That's the starting point. There is no economic benefit here. For example, in the case they rely upon, ESG Watts, there was a $40,000 economic benefit. They started with that, and then I believe they tacked on an additional $20,000 and made it a $60,000 penalty. In TOIL, which is another case they rely upon, there was a $316,440 economic benefit. Here, there's no evidence in the record, because there isn't any, of any economic benefit to Iron Hustler. I know Justice Peterson had asked about compliance agreements, and there were some proposed here, but were, I mean, what happened with those? They just rejected them or couldn't come to a meeting in line? Yeah, so there's two different points at which Iron Hustler proposed compliance commitment agreements. The first time was in writing, the formal exchange of the letters. Iron Hustler, that's when Iron Hustler submitted their proposal to enter into a compliance commitment agreement, but five days before the IEPA received that, it was rejected, even though it hadn't been made. And then the second time was in a meeting, an in-person meeting, between Iron Hustler and the Illinois Environmental Protection Agency, in which, and this is described in the affidavit of David Sheline, IEPA was asked, is there anything else we can do? They laid out, here's what we've done. We cleaned up the property within four days of learning. We terminated the employees who were involved. Here's the policies that we've put in place to make sure this doesn't happen again. We've engaged our counsel to prepare agreements from the companies we deal with, the people we deal with, our truckers, that this won't ever happen again. What else can we do? And his affidavit establishes they said nothing. There's nothing you can do. So we're referring this to the Illinois Attorney General's Office for imposition of penalties. Thank you.